1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **EASTERN DISTRICT OF CALIFORNIA**

10

11   CARNELL PARRISH,                          Case No. 1:23-cv-00284 JLT CDB

12                    Plaintiff,               ORDER GRANTING MOTION FOR
                                               SUMMARY JUDGMENT
13   v.
                                               (Doc. 26)
14
     WALMART ASSOCIATES, INC., et al.,
15
                    Defendants.
16

17          Carnell Parrish alleges his former employer, Walmart Associates, Inc., discriminated

18   against him based on a disability and subjected him to other unlawful treatment in violation of the

19   California Fair Employment and Housing Act .  Walmart moves for summary judgment.  As

20   explained in this order, that motion is **GRANTED**.

21                              **BACKGROUND**

22          Parrish began working in a Walmart store Delano, California, in 2018.  (Doc. 26-2 ¶ 1.)  A

23   few years after he started, in August 2021, he was helping a coworker pull down a gate on a baler

24   when he felt a tearing sensation in his chest, neck, and back.  (Doc. 28-2 ¶ 9; Doc. 28-1 at 24, 32.)

25   His heart began to beat rapidly.  (Doc. 28-1 at 32.)  He told his supervisor he needed to leave and

26   drove himself to the hospital.  (*Id.* at 25–26.)  At the hospital he received treatment to slow his

27   heartbeat, and doctors said he could go back to work, but Parrish felt "exhausted and weak," so he

28   did not return to work that day.  (*Id.* at 30, 34–35.)  He visited the store briefly to give his

                                                  1

1    manager some paperwork, then went home to rest.  (*Id.* at 30.)

2              Doctors later determined that Parrish had experienced "supraventricular tachycardia" or

3    "SVT," also known as "arrythmia."  (Doc. 26-2 ¶ 2.)  In his filings, Parrish asserts that SVT is a

4    "serious heart condition" that will require treatment "for the rest of his life."  (*E.g.*, Doc. 28 at 8.)

5    He does not support that statement.  He does not, for example, cite any subject-matter references

6    to explain what SVT is, nor the opinions of any medical or other subject-matter experts.  The

7    evidence cited in his filings also casts doubt on his claims.  He refers first to his own deposition

8    testimony, but on the cited pages are only his admissions that he does not know what "SVT" is

9    and that he has received no medical diagnosis or explanation for why he experienced it.  (*See*

10   Doc. 28-1 at 29, 72.)  He next cites a report he received on the day he went to the hospital, which

11   confirms that he had experienced SVT, but according to that report, he had no condition that

12   would have "impeded or [would] delay" his recovery, and he could return to work immediately

13   without any restrictions.  (*See id.* at 445.)  Finally, he cites a form completed by a doctor of

14   internal medicine a few days after his initial hospital visit.  (*See id.* at 429–31.)  The doctor

15   excused Parrish from work for about a week based on an unspecified "condition."  (*Id.* at 430.)

16   He did not refer to SVT, arrythmia, or any other medical condition, cardiovascular or otherwise.

17   As for treatment, the form prompted the doctor to state whether Parrish would "need to have

18   treatment visits at least twice per year due to the condition. "  (*Id.*)  The doctor checked the line

19   for "Yes."  (*Id.*)  But he did not say what the condition was or what treatments Parrish might

20   need.

21              Parrish went on an approved medical leave of absence from his job at Walmart for about

22   three months after his hospital visit.  (Doc. 26-2 ¶ 2.)  Forms completed by his healthcare

23   providers show his condition—which, again, they did not diagnose or describe—was not related

24   to his work (Doc. 28-1 at 445), that he did not have any other conditions that impeded his work

25   (*id.*), that he could return to his regular job without any restrictions when his leave ended (*id.* at

26   432, 445), and, as noted above, that he would need occasional treatment visits (*id.* 430).  Beyond

27   these forms, Parrish offers only his personal assessment of his health during and after his leave:

28   he "wasn't feeling well" and was "weak."  (*See* Docs. 28 at 9–10; 28-1 at 40.)

1    When Parrish returned to work, it seemed to him that "everything" had "changed." (*Id.* at

2    90.)  In his view, his supervisors were treating him differently, as if they were frustrated that he

3    had been out and did not need him at the store.  (*See id.* at 70, 90.)  Beyond these broad and

4    subjective impressions, however, Parrish can describe only one time when someone treated him

5    poorly or acted differently.  (*See* Docs. 26-2 ¶ 4; 28-1 at 72–73.)  One day, he sat down to tie his

6    shoe.  (Doc. 28-1 at 72.)  About five minutes later, someone called him into the store manager's

7    office, and the store manager, Francisco Medina, spoke to him as if he were a child, even though

8    he was in his sixties at the time.  (Docs. 26-2 ¶ 4, 28-1 at 72.)  Parrish does not say why Medina

9    wanted to speak with him in his office, nor what they discussed.  (*See* Doc. 28-1 at 72–73.)  He

10    does not explain why Medina's tone or language made him think he was treating him like a child,

11    nor why he made any connection between Medina's tone and his health, his leave, or the quality

12    of his work.  (*See id.*)  It is also unclear from Parrish's description of this episode whether

13    Medina—or anyone else, for that matter—even saw Parrish sitting down or tying his shoe.  (*See*

14    *id.*)

15    In any event, soon after Parrish came back to the store, he asked one of his supervisors,

16    Jacob Castillo, if he could work four-hour shifts rather than eight-hour shifts.  (Doc. 28-1 at 39.)

17    He made the request because he "wasn't feeling well" and was "weak."  (*Id.* at 47, 52.)  Castillo

18    agreed.  As Parrish remembers it, Castillo told him, "That's fine.  Come in, work your hours, and

19    go home."  (Doc. 28-1 at 46.)  Parrish also remembers Castillo reassuring him that he would

20    secure any necessary approvals from Medina.  (*See id.*)

21    One important detail is unclear, however, at least on the record as the parties have

22    presented it: whether Parrish told Castillo—and whether Castillo understood—that Parrish's

23    request to work shorter shifts had something to do with Parrish's health.  Although Castillo knew

24    Parrish had been out of work on medical leave, he was not "privy" to any information about his

25    leave or his health or his medical condition.  (Doc. 28-1 at 231.)  As noted, doctors had cleared

26    Parrish to work without restrictions, and Parrish did not "submit any documents or records from

27    his doctor" to support his request for fewer hours.  (*Id.* at 47.)  In his deposition, Parrish also said

28    his request for shorter hours "had nothing to do with my doctor" (*id.*), and he did not say whether

3

1    he told Castillo that his request was based on any health problems (*see id.* at 46–47).  In fact, as

2    Castillo remembers their conversation, Parrish gave a different reason: he wanted more time to

3    take care of his dogs, and he did not mention any sort of medical condition.  (*Id.* at 230–31, 283–

4    84.)  It is undisputed, in fact, that Parrish's work at Walmart was not his primary source of

5    income at the time; he made most of his income breeding dogs.  (Doc. 28-2 ¶ 18.)  He was

6    working at Walmart for other reasons.  (*Id.*)

7        With that said, at least a few documents produced by Walmart in this case do connect

8    Parrish's request to his health, albeit only indirectly and without specifics.  First, Walmart stated

9    in a written discovery response that Parrish "asked to work less hours which would put less stress

10   on his body."  (*Id.* at 408.)  Second, a written report from an later internal investigation includes a

11   few references to Parrish's health when it discusses his request.  (*See id.* at 410.)  According to

12   that report, Parrish "stated that he was released to go back from his doctor, and he could only

13   work 5 hour days."  (*Id.*)  He "stated that he was asked to make a ball,[1] and cannot due to his

14   health."  (*Id.*)  Someone—either Castillo or Parrish, the report is ambiguous—also "stated" that

15   Parrish was "only working the back half of the shifts" because he was "hurt."  (*Id.*)  Third,

16   Medina also appears to have understood by January 2022 that the limits on Parrish's schedule

17   were "due to his condition."  (*See id.* at 378.)

18       Parrish began working less than eight hours per day after he spoke with Castillo.  (*See id.*

19   at 48.)  But on paper, his schedule was unchanged.  (*See id.* at 47–48.)  He was still scheduled to

20   work eight hours per day.  (*See id.*)  Castillo had not changed the schedule.  Walmart faults

21   Parrish for failing to submit an "availability form" to document the change in his schedule, as he

22   had done in the past.  (*See* Doc. 28-2 ¶¶ 21–22.)  Parrish faults Castillo for not taking care of the

23   ministerial details immediately after their conversation.  (*See id.*)

24       Because Parrish was clocking in or clocking out at times that did not match his officially

25   scheduled hours, he began accruing "points" under Walmart's attendance policy.  (*See* Doc. 28-2

26

27   ─────────────────
     1  The parties do not explain what it means to "make a ball," but given the context of the report,

28   and because Parrish's arrythmia happened while he was helping a coworker with a baler, it seems
     most likely someone asked Parrish to make a "bale."  This ambiguity is not material.

1    ¶ 26.)  He accrued enough points that his name appeared on a list generated by the store's human

2    resources department.  (*See id.* ¶¶ 27–28.)  One of his supervisors, Celina Pinedo, received a

3    notice that his name was on this list.  (Doc. 28-1 at 313–14.)  Parrish was not at work when she

4    received this notice, and it was the company's policy not to contact employees off the clock, so

5    Pinedo called Castillo to ask if he knew anything about why Parrish was on the points list.  (*Id.* at

6    228–29, 313–14.)  Castillo told her to "go ahead" and "take care of the termination."  (*Id.* at 314.)

7    For whatever reason, he did not mention anything about his conversation with Parrish or his

8    agreement that Parrish could work shorter hours.  (*Id.*)  So Castillo and Pinedo processed the

9    paperwork that put Parrish's termination in motion.  (*See id.* at 311–14.)

10            Parrish found out about his termination when he came into the store for his shift on

11    November 30, 2021.  (*See id.* at 55.)  As he remembers that day, the system wouldn't allow him

12    to sign in for his shift, so he went to talk to Castillo.  (*See id.* at 55–56.)  From Parrish's

13    perspective, Castillo seemed to know "what was going on," and he told Parrish to speak with

14    Pinedo.  (*Id.* at 56.)  Parrish recalls that when he asked Pinedo why he could not clock in, she

15    seemed confused until she discovered that he had been terminated for missing work or being late

16    too many times, i.e., for having too many "points."  (*See id.* at 55–58.)  She gave him his

17    termination notice, which stated that he had been terminated for violating Walmart's attendance

18    and reporting policy, and she apologized to him "over and over."  (Docs. 26-2 ¶ 3; 28-2 at 57–

19    58.)

20            Pinedo remembers for her part that Parrish seemed "shocked" when he learned that he had

21    been terminated, and she remembers how he explained to her that Castillo had approved his

22    reduced schedule.  (Doc. 28-1 at 315.)  She remembers apologizing to Parrish, telling him she

23    would follow up with Castillo, and suggesting that Parrish ask Medina, the store manager, to

24    reinstate him.  (*Id.* at 316.)  When she later asked Castillo if he knew anything about Parrish's

25    "conditions" or "a reduced schedule," Castillo appeared to remember with visible surprise that he

26    had approved Parrish's request; he said "something along the lines of shoot, yeah, he was."  (*Id.*

27    at 316.)

28            The parties now agree that the termination was in error.  (*See* Doc. 28-2 ¶¶ 26–28, 31–33.)

1    But at the time, Parrish felt like Walmart was discriminating against him based on his age or

2    health conditions.  (*Id.* at 62.)  Medina also seemed to be avoiding him when he went back to the

3    store and tried to speak with him.  (*See id.* at 59–60.)  He called Sedgwick, a third-party company

4    that Walmart has engaged to handle employees' leave requests, in an attempt "to find out why

5    [he] was terminated." (*See id.* at 63.)  He also filed a complaint.  (*Id.*)  A Walmart human

6    resources manager, Amanda Armstrong, explains in a declaration that Parrish made an "Open

7    Door Complaint" on a Walmart "ethics hotline," in which he said that he "did not understand why

8    he had been terminated." (Doc. 26-3 ¶ 9.)  Records of an internal investigation show that a

9    Walmart representative contacted Parrish and that he gave her more information about his

10   concerns.  (*See id.* at 95–124.)  The same records show that a company representative spoke with

11   Castillo, and eventually, in January 2022, that the company "determined that the situation was not

12   handled correctly and that the associate," i.e., Parrish, "would be reinstated."  (*Id.* at 97.)

13          Armstrong, Castillo, Pinedo, and Medina all agreed in the end that "Parrish should be

14   reinstated," that he "needed to have his job back." (Docs. 36-4 ¶ 19; 28-1 at 257, 316.)  The

15   timing and nature of their agreement does leave a few questions unanswered.  For example, it is

16   unclear on the current record, at least as the parties have presented it, whether any of Parrish's

17   supervisors or the store manager could have reinstated him immediately after clearing up any

18   confusion about his schedule, and if so, why they did not do so.  Castillo also seems untroubled

19   by the apparent error.  He does not believe in retrospect that he should have done anything

20   differently.  (Doc. 28-1 at 281.)  Medina also expressed concerns about the way Parrish handled

21   the situation, but he explained in his deposition that it was "common for Walmart to reinstate

22   employees that had previously been terminated," even if in "questionable" situations when

23   something "wasn't done correctly" or the employee was at fault.  (Doc. 28-1 at 145–46, 149.)

24   But again, there is no dispute that all agreed to reinstate Parrish.

25          Parrish did not return to work.  Armstrong (the human resources manager) called him "to

26   inform him that Walmart had concluded its investigation," and she "asked him to meet with Mr.

27   Medina, who would discuss the next steps, including his reinstatement," but Parrish did not speak

28   to Medina.  (*See* Doc. 26-3 ¶ 21.)  A local human resources representative also called Parrish, but

1   "he did not express interest in returning." (Doc. 28-1 at 381.)  He told her, in fact, using "a few

2   choice words," that he was "suing Walmart and he wasn't coming back." (*Id.* at 380.)  Parrish

3   doesn't remember this conversation in detail, but he does remember that someone called him and

4   "basically tried to give me my job back." (*Id.* at 63.)  He declined because, in his words, "I was

5   discriminated against and wrongfully terminated.  Why would I want to go through that again?"

6   (*Id.* at 64.)  He also points out that he would not have been eligible for backpay if he had returned

7   to the store.  (*See id.* at 454.)

8       Parrish filed a lawsuit against Walmart in California Superior Court.  (Doc. 1-3 at 10–25.)

9   He asserts four claims, all under the FEHA:

10      (1)    Disability discrimination in violation of Government Code section 12940(a),

11      (2)    Failure to make a reasonable accommodation for a known physical disability in

12             violation of Government Code section 12940(m),

13      (3)    Failure to engage in a timely, good faith, interactive process in violation of

14             Government Code section 12940(n), and

15      (4)    Retaliation in violation of Government Code section 12940(h).

16      Walmart removed the case to this Court under 28 U.S.C. §§ 1332 and 1441.  (Doc. 1.)  It

17   now seeks summary judgment.  (Doc. 26.)  Parrish opposes the motion (Doc. 28), and Walmart

18   has filed a reply in response to his opposition (Doc. 29).  The Court took the matter under

19   submission without hearing oral arguments.  (Doc. 27.)

20                          **STANDARD OF DECISION**

21      The Court can grant summary judgment only if "the movant shows that there is no

22   genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

23   Fed. R. Civ. P. 56(a).  Material facts are those that may affect the outcome of the case.  *Nat'l*

24   *Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing

25   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A dispute is genuine "if the evidence

26   is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477

27   U.S. at 248.

28      "A moving party without the ultimate burden of persuasion at trial—usually, but not

7

1    always, a defendant—has both the initial burden of production and the ultimate burden of

2    persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*,

3    210 F.3d 1099, 1102 (9th Cir. 2000).  To carry its burden of production, the moving party must

4    either: (1) produce evidence negating an essential element of the nonmoving party's claim or

5    defense; or (2) show that there is an absence of evidence to support the nonmoving party's case.

6    *Id.*

7         If the moving party fails to carry this initial burden, the nonmoving party has no

8    obligation to produce anything.  *Id.* at 1102–03.  That is true even if the nonmoving party would

9    have the ultimate burden of persuasion at trial.  *Id.*  But if the moving party carries its burden of

10   production, the burden shifts to the nonmoving party to produce evidence showing a genuine

11   dispute of material fact for trial.  *Anderson*, 477 U.S. at 248–49.  To carry this burden, the

12   nonmoving party must "do more than simply show that there is some metaphysical doubt as to the

13   material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586

14   (1986).  "The mere existence of a scintilla of evidence . . . will be insufficient; there must be

15   evidence on which the jury could reasonably find for the [nonmoving party]."  *Anderson*, 477

16   U.S. at 252.  The nonmoving party must "go beyond the pleadings and by [its] own affidavits, or

17   by the depositions, answers to interrogatories, and admissions on file, designate specific facts

18   showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324

19   (1986) (quotation marks omitted).  If the nonmoving party fails to produce enough evidence to

20   create a genuine issue of material fact, the Court must grant the motion.  *Id.* at 322.

21        In deciding a motion for summary judgment, the Court must view the evidence in the light

22   most favorable to the nonmoving party and draw all justifiable inferences in that party's favor.

23   *Anderson*, 477 U.S. at 255.  The Court does not make credibility determinations or weigh

24   evidence.  *Id.*  But conclusory, speculative testimony does not raise a genuine issue of fact.

25   *Thornhill Publ'g Co., Inc. v. Gen. Tel. & Elec. Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).  Nor

26   does the Court rely on evidence that cannot be presented in a form that would be admissible at

27   trial.  *See* Fed. R. Civ. P. 56(c).

28        */////*

8

**DISCUSSION**

**I.    Discrimination and Retaliation**

In Parrish's first claim, he alleges Walmart discriminated against him on the basis of a disability.  The FEHA provision he cites makes it "an unlawful employment practice" for an employer to discriminate against a person "in compensation or in terms, conditions, or privileges of employment" "because of" that person's actual or perceived "physical disability," among other reasons.  Cal. Gov. Code §§ 12940(a), 12926(m); *Price v. Victor Valley Union High Sch. Dist.*, 85 Cal. App. 5th 231, 239 (2022).

Walmart argues Parrish cannot prove he had a "physical disability."  (Doc. 26-1 at 14–15.)  Parrish argues he has a physical disability as a result of his arrythmia, which affects his cardiovascular system, citing the relevant statutory definitions.  (Doc. 28 at 15.)  There is no dispute about those definitions.  The Government Code defines "physical disability" as "any physiological disease" or "condition" that does two things: (1) it affects one or more of several listed "body systems," including the "cardiovascular" system, and (2) it "[l]imits a major life activity."  Cal. Gov. Code § 12926(m)(1)(A)–(B).  "Major life activities" are "broadly construed" and include "physical, mental, and social activities and working."  *Id.* § 12926(b)(1)(B)(iii).  A condition "limits" a major life activity "if it makes the achievement of the major life activity difficult."  *Id.* § 12926(m)(1)(B)(ii).  A person also has a "physical disability" for purposes of the statute if that person has a "record or history" of a disease or condition that meets the criteria above, provided that the employer knows about that record or history.  *Id.* § 12926(m)(3).  The same is true if the employer regards or treats the person as though they have a qualifying condition.  *Id.* § 12926(m)(4)–(5).  In short, as applied to this case, a cardiovascular condition is a physical disability if it makes working more difficult, if the employer treats or regards the employee as though he has a cardiovascular condition that makes working more difficult, or if the employer knows about the employee's records or history of a cardiovascular condition that makes working more difficult.

Walmart has carried its initial burden at the summary judgment stage by laying out the relevant evidence and explaining why, in its assessment, Parrish could not prove a cardiovascular

1    condition makes working more difficult, could not prove the company regarded him as having

2    such a condition, and could not prove the company knew about any records or a history showing

3    Parrish had such a condition.  *See Nissan Fire & Marine*, 210 F.3d at 1102; (*see also* Doc. 26-1 at

4    15–16).  It underscores the absence of any evidence in the record explaining what condition

5    Parrish had, what restrictions he faced, and why, among other things.  (*See* Doc. 26-1 at 15–16.)

6    It is thus Parrish's burden to come forward with responsive citations to specific portions of the

7    record—evidence that could be presented in an admissible form at trial—showing there is a

8    genuine dispute.  *See Nissan Fire & Marine*, 210 F.3d at 1102–03.

9         Parrish has not carried that responsive burden.  He has not cited evidence that could prove

10   at trial that arrhythmia or another qualifying condition or disease made it difficult for him to work,

11   that the company believed that was so, or that any reports or records demonstrated as much.  To

12   the contrary, the undisputed record shows that on the same day Parrish originally sought medical

13   care, doctors released him to work again, without restrictions.  (Doc. 28-1 at 427.)  When he was

14   on medical leave, his healthcare providers did not attribute his symptoms to any cardiovascular

15   condition, medical condition, or diagnosis.  (*Id.* at 428–33.)  And when he returned from leave,

16   his healthcare providers put no restrictions on his ability to work.  (*Id.* at 433.)  As noted, Parrish

17   has not cited evidence to explain what medical treatment he received while he was on leave or

18   after his return to work, if any, nor any potentially admissible evidence about the reasons for his

19   symptoms, such as a declaration or a report from a doctor or another medical professional.  It is

20   undisputed, in fact, that the reason for his arrythmia is unknown and undiagnosed.

21        Parrish has offered only his own impressions and his attorneys' arguments to connect his

22   cardiovascular health to his ability to work: after the arrhythmia, he has felt weak and exhausted

23   and slow.  He cites no medical evidence that could prove arrythmia or any related cardiovascular

24   condition caused these symptoms.  He does not claim to have any relevant medical training or

25   expertise.  He is a layperson.  A layperson's opinions are not admissible at trial if they are "based

26   on scientific, technical, or other specialized knowledge," within the scope of Federal Rule of

27   Evidence 702, such as medical training.  Fed. R. Evid. 701(c).  A layperson can of course testify

28   about the pain or other symptoms he has experienced; that much is a matter of common and first-

1   hand experience. *Stevenson v. Holland*, 504 F. Supp. 3d 1107, 1121 (E.D. Cal. 2020). But

2   laypeople cannot offer their lay opinions about the medical causes of their symptoms, their

3   underlying medical diagnoses, or their prognoses. *See id.* Parrish could testify that he has felt

4   weak and exhausted, but he could not offer his own lay opinion to show that any particular

5   diagnosed condition or disease caused his weakness and exhaustion.

6       For these reasons, a layperson's proposal to testify about his medical conditions and their

7   causes does not create a genuine dispute of material fact at the summary judgment stage. For

8   example, in a professional negligence case, a plaintiff without medical training cannot rely on her

9   own opinions about the standard of care to avoid summary judgment. *See Hutchinson v. United*

10   *States*, 838 F.2d 390, 393 (9th Cir. 1988). An incarcerated plaintiff in a civil rights dispute with

11   prison medical staff cannot rely on his own lay opinions to prove his treatment amounted to

12   unconstitutionally deliberate indifference. *Allen v. Kernan*, No. 18-02586, 2020 WL 5834290, at

13   *18 (C.D. Cal. Aug. 4, 2020), *report and recommendation adopted*, 2020 WL 5548740 (C.D. Cal.

14   Sept. 15, 2020), *and aff'd*, No. 20-56022, 2022 WL 1403684 (9th Cir. May 4, 2022)

15   (unpublished); *see also, e.g.*, *Olivas v. Neubarth*, No. 09-00872, 2010 WL 431752, at *1 (E.D.

16   Cal. Feb. 2, 2010). And most relevantly, a plaintiff who asserts a disability claim under the

17   FEHA cannot rely on his untrained assessment of his own condition in opposition to a summary

18   judgment motion, especially when it is inconsistent with statements by his medical providers.

19   *See, e.g.*, *Kumar v. Alameda County Med. Ctr.*, No. 09-4312, 2011 WL 13244636, at *11–12

20   (N.D. Cal. Mar. 25, 2011); *Swonke v. Sprint Inc.*, 327 F. Supp. 2d 1128, 1133 (N.D. Cal. 2004).

21   California courts have held similarly that an employer "does not have to accept an employee's

22   subjective belief that he is disabled and may rely on medical information in that respect."

23   *Arteaga v. Brinks, Inc.*, 163 Cal. App 4th 327, 348 (2008) (collecting authority). Walmart is

24   entitled to summary judgment on Parrish's first claim.

25       Parrish faces another obstacle beyond this evidentiary gap. Walmart has cited evidence

26   that could show his termination was not "because of" a disability, but rather a mistaken

27   application of its automatic points system, an error unrelated to anyone's opinions or knowledge

28   of his health. To resolve similar disputes in cases that, like this one, involve no direct evidence

1    that the employer was motivated by a disability or perceived disability, California courts use the

2    three-step burden-shifting test established by the United States Supreme Court in *McDonnell*

3    *Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Price*, 85 Cal. App. 5th at 239; *Wallace v.*

4    *County of Stanislaus*, 245 Cal. App. 4th 109, 123 (2016)  Under this test, after a plaintiff

5    establishes a "a prima facie case of disability discrimination" at trial, *see Price*, 85 Cal. 5th

6    at 239, the employer has an opportunity to give "a legitimate reason" for its actions, *Wallace*, 245

7    Cal. App. 4th at 123.  If the defendant offers a legitimate, nondiscriminatory reason, then the

8    plaintiff must prove the employer had a discriminatory motive, such as by "attacking the

9    employer's proffered reasons as pretexts for discrimination."  *Id.*

10          And so, even if one assumes for purposes of argument that Parrish could make a necessary

11   prima facie case of disability discrimination at trial, Walmart would have an opportunity to lay

12   out the evidence, summarized above, about his mistaken termination: his request to Castillo,

13   Castillo's approval, the mismatch between Parrish's hours and his official schedule, his accrual of

14   points, his resulting termination, the company's investigation, the resolution of that investigation

15   in Parrish's favor, and Walmart's unsuccessful attempt to reinstate him.

16          Although it would be Parrish's ultimate burden to prove at trial that this explanation is not

17   to be believed, it is Walmart's burden at this point to show there are no genuine disputes of

18   material fact.  *See Nissan Fire & Marine*, 210 F.3d at 1102–03.  Parrish need only come forward

19   with enough evidence to "create a genuine issue of material fact."  *Id.* at 1103.  He has not done

20   so.  He does not dispute that Castillo approved his request for reduced hours.  He does not dispute

21   that for some reason, his schedule was not officially updated.  He does not dispute that this led to

22   an accrual of points when he did not work a full eight-hour shift.  He does not dispute that

23   Castillo and Pinedo processed termination paperwork based on the accrued points.  And he does

24   not dispute that after he complained, Walmart investigated, concluded that he had been

25   terminated in error, and asked him to come back.  He cites no portions of the record contradicting

26   Walmart's evidence, which shows each of his supervisors concurred in the company's decision to

27   reinstate him.  He cites no evidence that any Walmart employee said anything about his health or

28   condition.  He relies instead on his subjective beliefs about the unspoken thoughts of unnamed

                                                    12

1   employees, and he says Medina once used a tone that seemed condescending.  To defeat a motion

2   for summary judgment based on evidence of an employer's legitimate and nondiscriminatory

3   reasons, the opposing employee must propose "proof" that could permit a jury to conclude those

4   reasons are a pretext or illegitimate.  *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018,

5   1029 (9th Cir. 2006).  It is not enough to argue that the employer's reasons or witnesses are not

6   credible or to offer the plaintiff's own "subjective belief."  *Id.* at 1029 n.6.

7          Parrish argues a trial is necessary because there is "direct evidence" of a discriminatory

8   motive in this case, citing the California Court of Appeal's decision in *Wallace v. County of*

9   *Stanislaus*.  (*See* Doc. 28 at 17–18 (citing 245 Cal. App. 4th 109).)  If that is true, then the three-

10  part burden-shifting test would not come into play, and rather than merely offering a legitimate

11  reason for the termination, Walmart would need to show it would have made the same decision

12  absent any consideration of Parrish's health or medical conditions.  *See Morgan v. Regents of*

13  *Univ. of Cal.*, 88 Cal. App. 4th 52, 67–68 (2000).

14         Evidence is "direct" in the relevant sense when it proves discriminatory intent without

15  inferences or presumptions.  *Id.* at 67 (citing *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221

16  (9th Cir. 1998)).  But "[t]here must also be evidence of a causal relationship between the animus

17  and the adverse employment action."  *DeJung v. Superior Ct.*, 169 Cal. App. 4th 533, 550 (2008).

18  For example, in cases of alleged race, sex, or age discrimination, an employee plaintiff could cite

19  derogatory comments about people in a protected group and show there is a cause-and-effect

20  relationship between the comments and the adverse action.  *See, e.g.*, *Godwin*, 150 F.3d at 1221;

21  *Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145, 1147 (9th Cir. 1997); *DeJung*, 169 Cal. App. 4th

22  at 550.  In a case of alleged disability discrimination, an employer might expressly attribute its

23  decision to its beliefs about the plaintiff's disability.  In *Wallace*, for example, the defendant

24  removed the plaintiff from his post and put him on unpaid leave based on an orthopedic surgeon's

25  opinions about his physical limitations.  *See id.* at 117–18, 123 n.9; *see also, e.g.*, *Glynn v.*

26  *Superior Ct.*, 42 Cal. App. 5th 47, 54 (2019) (termination due to mistaken belief that the plaintiff

27  was totally disabled and unable to work).

28         Parrish has not cited direct evidence of this type.  He argues first that his accrual of

13

1    "points" is direct evidence of disability discrimination because Castillo approved his request for

2    shorter hours and he had no other absences.  (*See* Doc. 28 at 17.)  The California Court of Appeal

3    has expressly held, however, that a termination based on a lack of attendance is not direct

4    evidence of discrimination, even if the employee claims his only absences were attributable to a

5    disability.  *See Zamora v. Sec. Indus. Specialists*, 71 Cal. App. 5th 1, 37 (2021).  Parrish

6    emphasizes similarly that his supervisors knew about his recent medical leave.  (*See* Doc. 28 at

7    16–17.)  But the Court of Appeal also rejected essentially the same argument in *Zamora*.  *See* 71

8    Cal. App. 5th at 37.  This type of evidence is "at best circumstantial."  *Id.*

9            Parrish also juxtaposes Castillo's willingness to approve his request to work fewer hours

10   with Castillo's unexplained approval of Parrish's termination a few days later.  (*See* Doc. 27 at

11   17.)  But this juxtaposition could reveal a discriminatory motive only if one infers or presumes

12   that Castillo did not simply forget what he had said and that he knew Parrish's points were all

13   attributable to a disability.  Because these inferences or presumptions are necessary, the evidence

14   is not direct.

15           Finally, Parrish cites an email in which Medina said he wanted to "bring back or clear"

16   any associates on a leave of absence.  (Doc. 28-1 at 412.)  Parrish argues the email shows Medina

17   wanted to terminate any employees who could not immediately return to work.  (*See* Doc. 28 at

18   16.)  Medina explained the email in his deposition.  (*See* Doc. 28-1 at 170–75.)  He testified that

19   he was discussing an automatic weekly report of the employees who were currently taking a leave

20   of absence.  (*Id.* at 170.)  He testified that he hoped to learn "who really is on a leave of absence,

21   who's no longer on a leave of absence, who's coming back to work, who's not coming back to

22   work, did they find [an]other job, did they quit and did they not notify [the company] that they

23   quit and they're still on that list."  (*Id.* at 174.)  If any employees could be removed from the roll

24   because they did not plan to come back, the store could potentially hire someone new to take their

25   place.  (*Id.*)  Parrish does not claim that Medina contacted him while he was on leave or asked

26   him to cut his leave short.  For that reason, and because an employee might go on a leave of

27   absence for a variety of reasons unrelated to a disability, inferences and presumptions are again

28   necessary for the email to be relevant, so the evidence is not direct.

Parrish does not argue that this same evidence could show at trial that Walmart's explanation for his termination is not to be believed under the three-part *McDonnell-Douglas* test. The Court has no obligation to consider arguments or evidence if a litigant does not raise them in an opposition brief. *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1028–31 (9th Cir. 2001). The Court declines to comb the record and to consider in detail whether it should deny Walmart's motion based on arguments that Parrish does not himself advance. It suffices to note here, briefly, that the circumstantial evidence above does not contradict Walmart's evidence, which shows that Castillo approved Parrish's request to work shorter shifts; that Parrish was erroneously terminated based on his accrual of points, regardless of his alleged disability; that Walmart had no information about Parrish's medical conditions or any diagnoses; and that it attempted to reinstate him when it discovered its error and when it knew that his request was related to his health. The Court grants Walmart's motion for summary judgment of claim one, for disability discrimination.

California courts also use the three-step *McDonnell-Douglas* test in cases of alleged retaliation. *See Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1042 (2005). The reasoning above therefore applies equally to Parrish's retaliation claim. Assuming for purposes of argument that he could make out a prima facie case of retaliation, Walmart has cited evidence that could show at the second step that it was relying on legitimate, nondiscriminatory reasons. Because Parrish has not come forward with citations to portions of the record that could allow him to rebut Walmart's evidence at trial, there is no genuine dispute of fact, and Walmart is entitled to summary judgment of claim four as well.

## II.    Accommodation and Interactive Process

The parties agree that Parrish could prevail at trial in his second claim, for failure to accommodate, only by first proving he had a "disability" under the terms of the FEHA. (*See* Docs. 26-1 at 20; 28 at 17.) As explained in the previous section, Parrish has not cited evidence that could show at trial that he had a disability.

It would also be Parrish's obligation to prove at trial that Walmart knew about "the underlying facts" of his condition, even if it was not aware in particular that the condition amounted to a "disability" in the legal sense. *Cornell v. Berkeley Tennis Club*, 18 Cal. App. 5th

908, 938 (2017).  The employer must also be "aware" that the condition "has an underlying physiological cause" before it has a "duty to provide a reasonable accommodation" under the FEHA.  *Id.* at 939.  "Vague or conclusory statements revealing an unspecified incapacity are not sufficient to put an employer on notice of its obligations under the FEHA."  *Avila v. Cont'l Airlines, Inc.*, 165 Cal. App. 4th 1237, 1248 (2008) (quoting *Brundage v. Hahn*, 57 Cal. App. 4th 228, 237 (1997)).

In *Brundage*, for example, the employee plaintiff "attempted to create a triable issue of fact" by demonstrating that the company "knew she had taken a substantial amount of leave" and by showing she had "submitted copies of her leave requests for medical appointments."  57 Cal. App. 4th at 237.  She did not tell her employer that she had a disability, however, and the documents she cited did not "even hint" that she had a disability, so there was no evidence that could show the employer had failed to accommodate her in violation of the FEHA.  *See id.*  The situation in *Avila* was similar: the plaintiff was hospitalized and went on leave, and he submitted forms stating how long he would be unable to work.  *See* 165 Cal. App. 4th at 1249.  But the forms did not specify what condition the plaintiff had, and he returned to work without restrictions.  *Id.*  Nor did the evidence demonstrate the plaintiff had a disability rather than an illness or sickness.  *See id.*  This meant there was no dispute and no need for a trial about the employer's obligations to accommodate the plaintiff under the FEHA.  *See id.* at 1249–50 (collecting similar authority).

The circumstances of this case are not meaningfully different from those in *Brundage* and *Avila*.  Parrish has not cited evidence that could show Walmart knew about his condition, its effects, its physiological causes, or whether it restricted his work.  The evidence does not show he or anyone at Walmart connected his weakness or exhaustion to a heart condition or a disability at the time of his termination.  His leave paperwork did not describe his condition, its causes, the treatment he would receive, or the effects of his condition on his work, or even that it limited his work.  His doctors released him to work without restrictions, both immediately after his arrythmia and when he returned from leave.  There is no genuine dispute of material fact to resolve in a trial about Parrish's accommodation claim.

16

1    Parrish's third claim is similar to his second claim.  He alleges Walmart did not engage in

2    good faith in an interactive process to find a reasonable accommodation for his disability.  The

3    FEHA obligates the employers it covers "to engage in a timely, good faith, interactive process

4    with [an] employee . . . to determine effective reasonable accommodations, if any, in response to

5    a request for reasonable accommodations by an employee . . . with a known physical or mental

6    disability or known medical condition."  Cal. Gov. Code § 12940(n).  California courts have thus

7    interpreted the FEHA as requiring plaintiffs to show they had a "disability" and that the disability

8    was "known" to the employer.  *See Gelfo v. Lockheed Martin Corp.*, 140 Cal. App. 4th 34, 61 &

9    n.21 (2006); *see also* Judicial Council of California, Civil Jury Instruction No. 2546 (Nov. 2024)

10   (listing elements).  "When a disability is not obvious, the employee must submit 'reasonable

11   medical documentation confirming its existence.'"  *Kao v. Univ. of S.F.*, 229 Cal. App. 4th 437,

12   450 (2014) (alterations omitted) (quoting Cal. Code Regs., tit. 2, § 11069(d)(2)).

13   For the reasons above, Parrish has not cited evidence that could prove he had a

14   "disability" for purposes of the FEHA, that his disability was obvious, that Walmart otherwise

15   knew he had a disability, or that Walmart had information that could have led it to believe Parrish

16   had a disability.  Parrish argues in his opposition that he "collapsed at work in front of coworkers

17   and his supervisor."  (Doc. 28 at 19.)  The evidence he cites does not support that assertion.  (*See*

18   Doc. 28-2 ¶ 10.)  No evidence in the record shows Parrish collapsed at work, nor that the reason

19   for his collapse was obvious, nor that this obvious reason was a disability.  The record as it now

20   stands, and as the parties have presented it, lacks any documentation of a disability or specific

21   medical conditions that could support an interactive process claim.

22   For these reasons, the Court grants Walmart's motion for summary judgment of claims

23   two and three as well.

24   ///

25   ///

26   ///

27   ///

28   ///

17

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

The motion for summary judgment (Doc. 26) is **GRANTED**.  The Clerk of Court is instructed to enter judgment in favor of the defendant and close the case.

IT IS SO ORDERED.

Dated:   **February 10, 2026**

UNITED STATES DISTRICT JUDGE